UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>          Plaintiff,<br><br>   v.<br><br>CHET'S WRECKING & AUTO PARTS COMPANY, INC.,<br><br>          Defendant. | Case No.<br><br>**COMPLAINT** |

### INTRODUCTION

1.      Without applying for or receiving a federal industrial stormwater discharge permit, Chet's Wrecking & Auto Parts Company, Inc. ("Chet's") has been discharging industrial stormwater from its automobile salvage yard and scrap metal recycling facility at 1571 Page Boulevard, Springfield, Massachusetts (the "Facility"). Pollutants from the Facility are picked up in stormwater and discharged through the City of Springfield's municipal separate storm sewer system ("Springfield MS4") into Bircham Bend Brook, a tributary of the Chicopee River. Chet's violations occur in an area designated by the Commonwealth and EPA as an environmental justice community because it has the potential to be disproportionately impacted by environmental harms and risks.

2.      Chet's is not properly monitoring or controlling its stormwater discharges as is required by the federal Clean Water Act. 33 U.S.C. §1251 *et seq.* (the "Clean Water Act" or the "Act").

3.    The Commonwealth of Massachusetts brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress Chet's illegal discharges of pollution.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

5.    On October 29, 2021, the Commonwealth provided notice of Chet's violations of the Clean Water Act, and of its intention to file suit against Chet's (the "Notice Letter"), to the Administrator of EPA; the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Chet's, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

6.    More than sixty days have passed since notice was served.

7.    This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

8.    The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters and the related health, safety, economic, recreational, aesthetic, and environmental benefits those waters provide. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Chet's failure to comply with the Clean Water Act, as alleged in this Complaint. The requested relief will redress the harms to the Commonwealth caused by Chet's activities. Chet's continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

9.      Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

10.     Plaintiff is the Commonwealth, appearing by and through the Attorney General.

11.     The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under G.L. c. 12, §§ 3 and 11D.

12.     Defendant Chet's Wrecking & Auto Parts Company, Inc. is a domestic corporation that lists its principal address as 1571 Page Avenue, Springfield, Massachusetts.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

13.     The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge follows certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

14.     Polluted stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, organic matter, nutrients, metals, and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people.

15.     To minimize polluted stormwater discharges from industrial facilities, EPA has issued a general industrial stormwater permit ("Stormwater Permit") under the NPDES program.

3

EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, 2015, and 2021. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 86 Fed. Reg. 10269 (Feb. 19, 2021).[1]

16.     Automobile salvage yards and scrap metal recycling facilities such as Chet's are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D-3 and D-4 (Sectors M and N).

17.     The Stormwater Permit requires the Facility to, among other things:

    a.     prepare a stormwater pollution prevention plan ("SWPPP") that includes all of the elements required by the Stormwater Permit, 2015 Stormwater Permit Section 5; 2021 Stormwater Permit, Section 6; Stormwater Permit, Section 8.M.3 (specifically for automobile dismantling facilities); and Stormwater Permit, Section 8.N.4 (specifically for scrap metal recycling facilities);

    b.     submit to EPA a Notice of Intent ("NOI") to be covered by the Stormwater Permit, 2015 Stormwater Permit, Section 1.2.1; 2021 Stormwater Permit, Section 1.3.2;

    c.     select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges in accordance with the requirements of Section 2 of the Stormwater Permit and any additional pollutant control requirements applicable to automobile salvage yards,

---

[1] The February 2021 revision of the Stormwater Permit ("2021 Stormwater Permit") is substantially similar to the 2015 version ("2015 Stormwater Permit"). Where there is a difference in citations due to numbering, this Complaint provides citations to each of the revisions. Where there is no difference in Section numbering, this Complaint refers to the two versions jointly as "Stormwater Permit."

Stormwater Permit, Section 8.M.2, and scrap metal recycling facilities, Stormwater Permit, Section 8.N.3;

d.    collect and analyze stormwater samples for polycyclic aromatic hydrocarbons ("PAHs") as required for automobile salvage yards, 2021 Stormwater Permit, Sections 4.2.1.1 and 8.M.5;

e.    collect and analyze stormwater samples for compliance with EPA benchmarks that apply to automobile salvage yards, including for total suspended solids ("TSS"), aluminum, and lead, Stormwater Permit, Section 8.M.6;

f.    collect and analyze stormwater samples for compliance with EPA benchmarks that apply to scrap metal recycling facilities, including for chemical oxygen demand ("COD"), TSS, aluminum, copper, lead, and zinc. Stormwater Permit, Section 8.N.7;

g.    report all benchmark monitoring data to EPA within mandatory deadlines, Stormwater Permit, Section 7;

h.    conduct and document corrective actions and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the permit, 2015 Stormwater Permit, Section 4.0; 2021 Stormwater Permit, Section 5.0;

i.    conduct routine Facility inspections and quarterly visual assessments to, among other things, sample and assess the quality of the Facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize

pollutant discharges, and ensure timely corrective actions are taken when they are not, Stormwater Permit, Section 3;

j.   comply with any additional inspection requirements applicable to automobile salvage yards, Stormwater Permit, Section 8.M.4, and scrap metal recycling facilities, Stormwater Permit, Section 8.N.5; and

k.   timely prepare and submit to EPA annual reports that include findings from the Facility inspections and visual assessments and the documentation of corrective actions, 2015 Stormwater Permit, Section 7.5; 2021 Stormwater Permit, Section 7.4.

## **Citizen Suit Provision of the Clean Water Act**

18.   Section 505(a)(1) of the Act authorizes citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

19.   The Commonwealth is a "person" having an interest which is or may be adversely affected. *See* 33 U.S.C. § 1365(g).

20.   Under Section 505 of the Act, this Court has authority to enjoin Chet's violations of the Act's prohibition on unauthorized discharges of pollutants and to require the company to comply with its Stormwater Permit. The Court also has authority to impose penalties of up to $59,973 per day for each of the Company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. §§ 19.4; 87 Fed. Reg. 1678 (Jan. 12, 2022).

6

## STATEMENT OF FACTS

### Description of Chet's Facility and Activities

21.     Chet's owns and operates an automobile salvage yard and scrap metal recycling facility on approximately three and a half acres on the border of Springfield's Indian Orchard and East Springfield neighborhoods.

22.     Chet's acquires materials composed of ferrous and non-ferrous scrap metal, including used automobiles, and then processes these materials into saleable products. During its processes, Chet's stockpiles unprocessed metal, final products, and waste materials ("Industrial Materials") at the Facility in large, uncovered piles and containers outside. Chet's moves Industrial Material around the Facility, dropping it into piles, containers, and onto the ground. Industrial Material that Chet's places or drops on the ground mixes with other sediments on the ground.

### Defendant's Discharge of Pollutants from the Facility

*Polluted Industrial Stormwater Discharges to Bircham Bend Brook via the Springfield MS4*

23.     During every rain or snowmelt event, runoff flows over Industrial Material, vehicles, equipment, and the ground surface at the Facility.

24.     Pollutants from activities at the Facility are picked up in stormwater and discharged into the Springfield MS4 via catch basins on Rocus Street. The following aerial photo, annotated by the Attorney General's Office, depicts the location of municipal catch basins on Rocus Street with red boxes, and shows the direction of stormwater flow from the Facility with red arrows.



25.    Pollutants at the Facility are also tracked around and off the Facility by heavy equipment and vehicles.

26.    Stormwater from the Facility that discharges off the Facility and stormwater from the Facility that is tracked off the Facility onto Rocus Street flows into catch basins on Rocus Street, through the Springfield MS4 to Bircham Bend Brook, and ultimately into the Chicopee River.

27.    Prior to reaching the Chicopee River, Bircham Bend Brook flows through ponds in the neighborhoods of Indian Orchard and East Springfield. The neighborhoods of East Springfield and Indian Orchard have been designated by the Commonwealth and EPA as environmental justice communities because they have the potential to be disproportionately impacted by environmental harms and risks.

8

28.     Since at least November 1, 2016, during the rain events listed on Attachment A, Defendant has discharged polluted stormwater from the Facility and into Bircham Bend Brook via the Springfield MS4.

*Potential Impacts from Pollutants in Chet's Stormwater Discharges*

29.     Stormwater discharged from automobile salvage yards and scrap metal recycling facilities is likely to contain numerous pollutants, including COD, TSS, lead, zinc, aluminum, and copper.

30.     COD is a measurement of organic matter in water. Excessive discharges of organic matter pose a risk of harm to water quality and aquatic life. When high levels of organic matter are discharged to a waterbody, the presence of bacteria, fungi, and other decomposer organisms increases. The presence of decomposer organisms and the decomposition process lowers the available oxygen in the water, impairing and potentially asphyxiating aquatic organisms.

31.     TSS is an indicator parameter that measures the presence of solids, or sediment, suspended in a water sample. Solids in automobile salvage yard and scrap metal recycling facility stormwater discharges are likely to include non-dissolved metal particles and contaminated soil. Even uncontaminated sediment destroys habitat, harms aquatic organisms, and can contribute to flooding. Sediment settles to the bottom of a river where it disrupts and smothers bottom feeding organisms. Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. For example, sediment in the water column increases turbidity, reducing light penetration, decreasing the ability of plant communities to photosynthesize, preventing animals from seeing food. In addition, other pollutants, including toxic pollutants such as heavy metals, pesticides, and

9

petroleum by-products, bind to sediment and can significantly impact water quality when carried by stormwater to rivers and other waterbodies.

32. Lead is commonly used as an additive in the steel making process to improve the machinability of the steel. It may be present in the coatings on scrap metal (paints, hot dips, etc.), or it may be present as pure metal, an alloy, or its oxides. The use of heat in the processing of steel scrap can release substantial amounts of lead fume, resulting in the settling of lead dust. Abrasive removal of surface coatings also creates lead dust. Lead on the surfaces of scrap metal and lead dust from the processing of scrap is picked up in stormwater and can adversely impact water quality. Lead dust also poses a significant threat to human health and safety. Adverse effects of lead in water on aquatic species occur at very low concentrations and include reduced survival, impaired reproduction, and reduced growth. Even at low levels, lead may cause a range of human health effects, including learning disabilities, kidney problems, and high blood pressure. Children are particularly vulnerable to impacts from lead contamination.

33. Zinc is used in metal alloys such as brass, nickel silver, and aluminum solder and is used in metal galvanizing, a process of applying a coating to steel or iron to slow the rate of corrosion. Adverse effects of excessive dissolved zinc among aquatic species include altered blood and serum chemistry, impaired reproduction, and reduced growth.

34. Aluminum is the most widely recycled nonferrous metal. Sources of aluminum in an automobile salvage yard and metal recycling facility may include left-over material from industrial processes (e.g., aluminum left over when can lids are punched out of sheets), or aluminum from building siding or fixtures. Elevated levels of aluminum can affect some species' ability to regulate ions, like salts, and inhibit respiratory functions, like breathing. Aluminum can accumulate on the surface of a fish's gill, leading to respiratory dysfunction and death.

35.    Copper can be found in pipes, electrical components, and electric wires. The storage and processing of these components can lead to contamination of stormwater runoff at automobile salvage yards and scrap metal recycling facilities. The melding or grinding of copper metal may increase the presence of copper dust. Copper in the environment at high concentrations has a negative impact on fish and wildlife and may impact predator avoidance behaviors, growth, and migration.

36.    The tributary creeks and wetlands within the Chicopee River watershed, including Burcham Bend Brook, are important in protecting aquatic resources by acting as a natural filtering system for water quality, preventing downstream flooding, and providing natural habitats to native species.

**<u>Chet's Failure to Comply with the Requirements of the Stormwater Permit</u>**

37.    Defendant has not submitted any Notice of Intent to be covered by the Stormwater Permit.

38.    Defendant has not complied with the terms of the Stormwater Permit. Defendant has failed to:

   a.    prepare a SWPPP for the Facility (violation of 2105 Stormwater Permit, Section 5; 2021 Stormwater Permit, Section 6);

   b.    submit an NOI for the Facility (violation of 2015 Stormwater Permit, Section 1.2.1; 2021 Stormwater Permit, Section 1.3.2);

   c.    select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges (violation of Sections 2, 8.M.2, and 8.N.3 of the Stormwater Permit);

   d.    collect and analyze stormwater samples for compliance with EPA

benchmarks that apply to automobile salvage yards and scrap metal recycling facilities (violation of 2015 Stormwater Permit, Section 6.2.1; 2021 Stormwater Permit, Section 4.2.2);

e.     report all benchmark monitoring data to EPA within mandatory deadlines (violation of Stormwater Permit, Section 7);

f.     conduct and document corrective actions and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the permit (violation of 2021 Stormwater Permit, Section 4.0; 2015 Stormwater Permit, Section 5.0);

g.     conduct routine Facility inspections and quarterly visual assessments to, among other things, sample and assess the quality of the Facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharges, and ensure timely corrective actions are taken when they are not (violation of Stormwater Permit, Sections 3.1, 3.2, 8.M.4, and 8.N.5); and

h.     timely prepare and submit to EPA annual reports that include findings from the Facility inspections and visual assessments and documentation of corrective actions (violation of 2015 Stormwater Permit, Section 7.5; 2021 Stormwater Permit, Section 7.4).

## FIRST CAUSE OF ACTION
### Discharges of Industrial Stormwater Without a Federal Stormwater Permit:
### Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)

39. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

40. Chet's is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

41. Bircham Bend Brook is a "navigable water" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

42. By discharging industrial stormwater from the Facility without a Stormwater Permit into the Springfield MS4, which carries that stormwater into Bircham Bend Brook, , Chet's has violated and continues to violate Section 301(a) of the Act, 33 U.S.C. § 1311(a).

43. Each day since October 21, 2017 that Chet's discharged industrial stormwater from the Facility into the Springfield MS4 without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§1365(a)(1) and (f).

44. These violations establish an ongoing pattern of failure to comply with the Act's requirements.

## SECOND CAUSE OF ACTION
### Noncompliance with the Federal Stormwater Permit:
### Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)

45. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

46. Chet's has violated and continues to violate the Stormwater Permit by failing to implement its requirements, as set forth in paragraph 38, above.

47.     Chet's violations of each of the requirements set forth in paragraph 38, above, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

48.     These violations establish an ongoing pattern of violations with the Stormwater Permit's requirements.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

49.     Require Chet's to obtain and comply with EPA's federal Stormwater Permit and to cease operations until it has obtained and is in compliance with the Stormwater Permit;

50.      Order Chet's to pay civil penalties of up to $59,973 per day for each of the Company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. §§ 19.4; 87 Fed. Reg. 1678 (Jan. 12, 2022).

51.     Order Chet's to take appropriate actions to restore the quality of waterways subjected to impairment from its unlawful activities;

52.     Award the Commonwealth's costs (including reasonable investigative, attorney witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

53.     Award any such other and further relief as this court may deem appropriate.

Dated: February 1, 2023

Respectfully submitted,


COMMONWEALTH OF MASSACHUSETTS

By its attorneys,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

*EField*

_____

Emily Mitchell Field (Bar No.703726)
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 727-2207
Emily.Field@mass.gov

15